[No. F034368. Fifth Dist. Aug. 31, 2000.]

In re LAURA F. et al., Persons Coming Under the Juvenile Court Law.
TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
BERNADETTE F., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II through V of the Discussion.

584

## COUNSEL

Patricia Ihara, under appointment by the Court of Appeal, for Defendant and Appellant.

Katheleen Bales-Lange, County Counsel, John A. Rozum, Chief Deputy County Counsel, and Bryan Walters, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

ARDAIZ, P. J.—Bernadette F., appeals from the order terminating her parental rights (Welf. & Inst. Code, § 366.26) to William C. and Laura F.[1] Because the minors are Indian children, the court was required to comply not only with California's dependency law, but also the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.), which establishes minimum federal standards, both procedural and substantive, governing the removal of Indian children from their families. (*In re Alicia S.* (1998) 65 Cal.App.4th 79, 81 [76 Cal.Rptr.2d 121].) The mother has also filed a petition to invalidate the termination order under the federal act (see 25 U.S.C. § 1914).

In the published portion of this opinion, we address the mother's contention that the trial court violated a full faith and credit provision contained in the ICWA (25 U.S.C. § 1911(d)) by not giving "absolute deference" to a tribal resolution voicing opposition to the adoption of its members who are dependent children, such as the minors herein. We hold the full faith and credit provision of the ICWA does not require a state court to apply a tribe's law in violation of the state's own legitimate policy nor does it empower a tribe to control the outcome of the state court proceedings. Having reviewed the record and relevant legal authorities, we will affirm the judgment and deny the petition for invalidation.

### PROCEDURAL AND FACTUAL SUMMARY

The mother has an extensive history, dating back to 1988, of drug abuse and drug-related arrests and incarcerations. In 1994, the Tulare County Superior Court sitting as a juvenile court removed her three oldest children because her substance abuse rendered her unable to properly care for the minors.[2]

On May 8, 1995, as she failed to comply with her case plan for reunification with her other children, the mother gave birth to Laura. Both Laura and the mother tested positive for opiates. Hospital staff also observed that

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] These children were eventually placed in long-term foster care because the older two were difficult to place and the court found it appropriate to keep all three children together.

Laura suffered from symptoms of controlled substance absorption in utero and controlled substance withdrawal. When interviewed, the mother admitted ingesting heroin four days before Laura's birth.

Consequently, the Tulare County Health and Human Services Agency (the Agency) initiated dependency proceedings on Laura's behalf based on the mother's failure or inability to provide due to her abuse of controlled substances (§ 300, subd. (b)). Because the mother was a member of the Tule River Indian Tribe (the Tribe), the Agency advised the juvenile court of the mother and Laura's Native American heritage and notified the Tribe of the proceedings. Parenthetically, the mother did not reside on the Tribe's reservation.

In June 1995, the court, having previously determined Laura was a minor described under section 300, subdivisions (b) and (g), adjudged her a dependent child of the court. In addition, the court removed Laura from parental custody and adopted a recommended reunification plan that included substance abuse evaluation and recommended treatment, drug testing, and parenting classes. The court also authorized the Agency to investigate suitable placement for Laura that would include relatives or foster parents who were Tribe members.

Commencing in January 1996, the Tribe began to informally participate in Laura's dependency proceedings (Cal. Rules of Court, rule 1412(i)(2)), through its representative, Louise Cornell. At that time, Cornell confirmed that the Tribe approved placement of Laura with her maternal great-aunt Brenda S., who was a member of the Tribe. Accordingly, the court authorized the relative placement.

As was the case with her older children, the mother did not successfully complete her reunification program as to Laura. The mother failed to test as directed for drugs on numerous occasions and had tested positive for opiates on the two occasions she did test. She had not completed a requisite residential drug treatment program and by her admission had not attended Narcotics' Anonymous meetings as ordered by the court. She did not attend, let alone complete, parenting classes.

Additionally, she was arrested in mid-1996 for being under the influence of a controlled substance and thereafter failed to take advantage of a diversion program in lieu of at least a one-year sentence. As a result, there was an outstanding warrant for her arrest.

In light of the mother's dismal performance, a social worker recommended that reunification services be terminated and a permanency planning

hearing be set. At an August 1996 review hearing, the mother submitted the matter without argument. The court made the requisite findings to continue Laura's out-of-home placement, terminated services, and set the matter for a section 366.26 hearing.

The Agency initially recommended adoption as a permanent plan for Laura based on her young age and good health. Her relative caregivers, who loved Laura and considered her part of their family, however, could not commit to adopting the child or becoming her legal guardian. The maternal great-aunt hoped Laura and her mother would reunite. Cornell, the Tribe's representative as well as its ICWA coordinator, also made it known that based on its customs and culture the Tribe was opposed to adoption as a general proposition for its members who were dependent children.

By February 1997, the Agency had modified its recommendation. Accordingly, the court selected long-term foster care as the permanent plan for Laura. Long-term foster care remained the court's permanent plan for Laura through two semiannual, postpermanency planning review hearings (§ 366.3). Notably, there was evidence that although there was a strong bond between Laura and her relative caregivers and the maternal great-aunt acknowledged reunification might never occur, a tribal representative dissuaded the relatives from pursuing adoption of Laura.

Then, on April 13, 1998, the mother gave birth to William. Tragically, he was also born with opiates in his system. Thus, within days of the infant's birth, the Agency initiated dependency proceedings as to William based on his prenatal drug exposure and his mother's abuse of his half siblings (§ 300, subds. (b) and (j)). As in Laura's case, the mother did not live on the Tribe's reservation at the time of William's birth.

The mother admitted she had a problem with illicit drug use. She used heroin during her pregnancy and within a couple of days of William's birth. She had failed to follow through with any drug treatment programs and expressed an unwillingness to comply with any recommendations or referrals.

In June 1998, the court adjudged William a dependent child, placed the infant with his mother's cousin, Mrs. P., who was also a member of the Tribe and ordered reunification services for the mother's benefit pursuant to the ICWA. Cornell, again as representative for the Tribe, voiced a desire to be involved in the case plan for the mother. The court endorsed the idea.

As in the past, the mother failed to comply with her reunification plan. She failed to submit to drug testing or complete any drug rehabilitation

program. The mother told a social worker that completing such a program was just "too difficult" and that she just could not do it. She visited William only once in six months and never called to check on him. By November of 1998, the mother's precise whereabouts were unknown. One of the mother's relatives thought the mother was homeless.

Due to the mother's lack of compliance with the case plan, the court in December 1998 continued William's out-of-home placement and terminated reunification services. During the same time frame Laura's relative caregivers had decided to pursue her adoption. Accordingly, the court elected to set a section 366.26 hearing for both minors in April 1999.

Reports prepared in anticipation of the section 366.26 hearing revealed the children had become very attached to their respective care providers who in turn wished to adopt them. The children's American Indian heritage could be maintained in each household, given the families' ties to the Tribe. The Agency recommended that both children be freed by adoption by their respective relative caregivers.

On the date originally set for the joint section 366.26 hearing, an attorney for the Tribe made a special appearance. While the Agency claims counsel's appearance amounted to the Tribe's intervention in the matter, there is no indication in the record that the Tribe ever formally moved to intervene. (See 25 U.S.C. § 1911(c); Cal. Rules of Court, rule 1412 (i)(1).) The Tribe, along with the mother, requested a contested hearing.

Consequently, the matter was put over to a date in July 1999. At that hearing, a referee selected legal guardianship as the permanent plan for each minor. However, the Agency moved for rehearing (§ 252), which the court granted. In turn, the referee's orders were vacated and the court calendared a trial de novo on permanency planning for September 1999.

At the September hearing, counsel for the Tribe once again made a special appearance. The court took judicial notice of its file as well as an April 1999 tribal resolution voicing opposition based on the Tribe's culture and customs to the adoption of dependent children such as the minors herein who are members of the Tribe. The Agency then called a single witness whom the court found qualified as an expert under the ICWA to render an opinion regarding whether Laura and William's continued custody by the mother was likely to result in serious emotional or physical damage to them (25 U.S.C. § 1912(f)).

Based on her experience, training, review of the files of each child, and her interviews of the social workers assigned to their cases, the witness was

"absolutely convinced" of such a risk of harm. The mother simply did not understand her drug addiction. Indeed, she had not even taken the first step towards recovery, that is, taking responsibility for her own use, let alone ever followed through with the treatment she needed. At this point, many treatment programs would not accept an in-patient client, such as the mother, who had already failed three or more treatment programs. The mother had not completed any of the five drug treatment programs in which she was previously enrolled.

Because of the mother's drug addiction, her continued custody would result in the minors' neglect, a lack of bonding between parent and child, as well as a lack of food and shelter for the children. It was also of importance to the witness that Laura and William were at a significant stage of development.

Other than to cross-examine the expert witness, neither the mother nor the Tribe introduced any evidence at the hearing. At the close of the hearing, the judge found clear and convincing evidence established that it is likely both Laura and William would be adopted. The court went on to find, beyond a reasonable doubt, that continued custody by the mother was likely to result in serious emotional or physical damage to the minors. It then terminated the mother's parental rights in both children and ordered them placed for adoption.

The mother filed a timely notice of appeal from the court's decision. She also filed a petition for invalidation of the judgment pursuant to the ICWA (25 U.S.C. § 1914).

DISCUSSION

I

*Full Faith and Credit*

*Background*

Prior to the permanency planning hearing originally scheduled for April 1999, counsel for the Tribe wrote the court, asking it to take judicial notice of a tribal resolution. The heart of the resolution read: "the Tule River Tribe, as a sovereign American Indian Nation with a government-to-government relationship with the United States, declares that its child-rearing practices and longstanding custom and tradition shall be recognized in all juvenile dependency proceedings involving a minor who is a Tule River Tribal

member or eligible for membership in the Tribe as evidence that adoption of the child is not in the interest of the child."[3]

---

[3]The full text of the resolution, which was attached as an exhibit to counsel's letter, provided:

"BE IT RESOLVED BY THE COUNCIL OF THE TULE RIVER INDIAN TRIBE:

"WHEREAS, the Tule River Tribe is governed under a Constitution and Bylaws duly adopted and approved by the Secretary of the Interior on January 15, 1936; and

"WHEREAS, Article VI, Section 1 (a) of the Tribal Constitution authorizes the governing body to enter into negotiations with federal, state or local agencies on behalf of the Tribe; and

"WHEREAS, the Tule River Indian Tribe is a Tribe as defined in the Indian Child Welfare Act of 1978, Section 4, Paragraph (8), as well as under California Rule of Court 1439(a)(6), and is the Tribe of the minor children involved in Case No. J-42853 in Tulare County Superior Court sitting as Juvenile Court; and

"WHEREAS, the customs and traditions of the Tule River Indian Tribe with regard to Indian family organization and child-rearing practices are either being misunderstood or ignored as long-standing customs and traditions of the Tule River Indian Tribe by Child Welfare Services; and

"WHEREAS, the statutory preference contained in California law for adoption of minors who cannot be returned to a biological parent within certain specified timeframes is in direct conflict with the long-standing child-rearing practices of the Tule River Indian Tribe, Indian family organization of the Tribe and the customs and traditions of the Tule River Indian Tribe; and

"WHEREAS, the long-standing customs and traditions of the Tule River Indian Tribe, a sovereign American Indian Nation, as well as the Tribe's child-rearing practices should not be treated as subordinate and inferior to the statutory preference contained in California Law; and

"WHEREAS, that the Tule River Indian Tribe hereby officially declares its long-standing child-rearing practice and Indian family organization by stating that the adoption of minors who are members of the Tribe or eligible for membership in the Tribe is contrary to the Tribe's custom and tradition and is not in said minors best interests; and

"NOW THEREFORE BE IT RESOLVED that the Tule River Tribe, as a sovereign American Indian Nation with a government-to-government relationship with the United States, declares that its child-rearing practices and longstanding custom and tradition shall be recognized in all juvenile dependency proceedings involving a minor who is a Tule River Tribal member or eligible for membership in the Tribe as evidence that adoption of the child is not in the interest of the child; and

"BE IT FURTHER RESOLVED that this resolution shall remain in effect until it is officially amended or rescinded, and that to do [sic] it has not been amended or rescinded in any way.

"CERTIFICATION

"UPON MOTION OF COUNCIL MEMBER **Alec Garfield**, SECONDED BY COUNCIL MEMBER **Heather Teran**, THE FOREGOING WAS ADOPTED BY THE TULE RIVER TRIBAL COUNCIL AT A DULY CALLED MEETING HELD ON **Tuesday, April 6, 1999**, AT WHICH A QUORUM WAS PRESENT BY THE FOLLOWING VOTES:

"AYES: 6

"NOES: 0

"ABSTAIN: 0"

The resolution appeared to be signed by Mr. Hunter, the chairman of the Tule River Tribal Council, and Ms. Santos, secretary of the Tule River Tribal Council. It was purportedly attested to by Ms. Perez, the recording secretary.

As alluded to above, at the outset of the September permanency planning hearing, the court announced it would take judicial notice of the resolution over the objection of the Agency and minors' counsel.

*Argument*

■■■ On appeal, the mother contends the resolution was entitled to full faith and credit under the ICWA (25 U.S.C. § 1911(d)). This provision requires all jurisdictions within the United States to give full faith and credit to "the public acts, records, and judicial proceedings of any Indian tribe [that are] applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records, and judicial proceedings of any other entity."[4] (25 U.S.C. § 1911(d).)

According to the mother, the tribal resolution was a public act, record, and judicial decision entitled to "absolute deference" in the juvenile court. Because the resolution provided that adoption was not in the best interest of dependent minors who were members of or eligible for membership in the Tribe, the mother therefore argues the court could not properly free Laura and William for adoption. As explained below, we disagree.

*Analysis*

The mother fails to cite, and our research does not disclose, any case law analyzing 25 United States Code section 1911(d), much less the mother's insistence on "absolute deference."[5] However, case law interpreting our federal Constitution's full faith and credit clause settles the issue. By analogy, we conclude the juvenile court did not violate the full faith and credit provision in the ICWA.

■■■ The constitutional full faith and credit clause requires each state to give effect to official acts of other states. (*Nevada v. Hall* (1979) 440 U.S. 410, 422 [99 S.Ct. 1182, 1189, 59 L.Ed.2d 416].) However, "precedence differentiates the credit owed to laws (legislative measures and common law) and to judgments." (*Baker v. General Motors Corp.* (1998) 522 U.S. 222, 232 [118 S.Ct. 657, 663, 139 L.Ed.2d 580].) The obligation is "exacting" as to judgments. (*Id.* at p. 233 [118 S.Ct. at p. 664].) A judgment

---

[4]We note that the "public acts, records and judicial proceedings" language in the ICWA full faith and credit statute is identical to that found in article IV, section 1 of the United States Constitution. We also observe that the language of this ICWA statute is very similar to that of the general federal full faith and credit clause statute. (Compare 25 U.S.C. § 1911(d) with 28 U.S.C. 1738.)

[5]The mother does cite numerous authorities which, we have read and considered. At most, the case law to which the mother refers may quote the ICWA's full faith and credit clause. None of her authorities explain the clause's application in a dependency matter.

entered in one state must be respected in another provided that the first state had jurisdiction over the parties and the subject matter. (*Nevada v. Hall, supra,* 440 U.S. 410, 422 [99 S.Ct. 1182, 1189].) Indeed, the United States Supreme Court has held that "credit must be given to the judgment of another state although the forum [state] would not be required to entertain the suit on which the judgment was founded." (*Milwaukee County v. White Co.* (1935) 296 U.S. 268, 277 [56 S.Ct. 229, 234, 80 L.Ed. 220].) "For claim and issue preclusion (res judicata) purposes, in other words, the judgment of the rendering State gains nationwide force." (*Baker v. General Motors Corp., supra,* 522 U.S. at p. 233 [118 S.Ct. at p. 664], fn. omitted.) The same rule, however, does not necessarily apply to statutory law.

"The Full Faith and Credit Clause does not compel 'a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate.' " (*Baker v. General Motors Corp., supra,* 522 U.S. at p. 232 [118 S.Ct. at p. 663].) Indeed, as the Supreme Court in *Nevada v. Hall, supra,* 440 U.S. 410, observed, the full faith and credit clause does not require a state to apply another state's statutory law in violation of its own legitimate public policy. (*Id.* at p. 422 [99 S.Ct. at p. 1189]; see also *Pacific Ins. Co. v. Comm'n* (1938) 306 U.S. 493, 502-505 [59 S.Ct. 629, 633-634, 83 L.Ed. 940].) With these principles in mind, we return to the case before us.

The first question is obvious. Was the resolution a public act, record or judicial proceeding of the Tribe? The face of the resolution does not provide any definitive answer. In addition, neither the mother nor the Tribe introduced any evidence in the juvenile court to establish the nature of the tribal resolution for purposes of 25 United States Code section 1911(d). At best, the record reveals argument below that the resolution was all three, that is, a public act, record and judicial proceeding of the Tribe.[6]

For the sake of the mother's argument, we will assume the resolution was either a public act or record of the Tribe, in other words a tribal statute. We will briefly explain however, before moving on, why we cannot find the resolution was a judgment or other enforceable order.

To begin, the Tulare County Superior Court sitting as a juvenile court and the Tribe had concurrent jurisdiction over child custody proceedings involving Laura and William inasmuch as these Indian children were neither

---

[6]Following oral argument and submission of the matter in this court, the mother asked this court to take judicial notice of the Tribe's constitution and bylaws in an effort to resolve the matter. She notably failed to offer any explanation for her failure to seek judicial notice of these documents in the trial court. We will deny the request for judicial notice.

domiciled nor residing within any reservation of the Tribe. (25 U.S.C. § 1911(b); *Mississippi Choctaw Indian Band v. Holyfield* (1988) 490 U.S. 30, 36 [109 S.Ct. 1597, 1602, 104 L.Ed.2d 29].) That is to say, under the circumstances either the juvenile court or the Tribe could conduct such proceedings.

Nevertheless, the record reveals the Tribe never exercised its jurisdiction over either child. As mentioned in our factual summary, almost immediately after the birth of first Laura and then William, the Agency initiated dependency proceedings to remove each child from the mother's custody. Notwithstanding the juvenile court's exercise of its dependency jurisdiction under section 300, the ICWA gave the Tribe the means by which to still exercise its jurisdiction over Laura and William. As the court in *Mississippi Choctaw Indian Band v. Holyfield, supra,* 490 U.S. 30, explained title 25 United States Code section 1911(b): "[O]n petition of either parent or the tribe, state-court proceedings for foster care placement or termination of parental rights are to be transferred to the tribal court, except in cases of 'good cause,' objection by either parent, or declination of jurisdiction by the tribal court." (*Mississippi Choctaw Indian Band v. Holyfield, supra,* 490 U.S. at p. 36 [109 S.Ct. 1182, 1602].)

If the matter is not transferred to a tribal court, the Tribe has the right to intervene in the state court proceedings at any time. (25 U.S.C. § 1911(c); *In re Alicia S., supra,* 65 Cal.App.4th at p. 83.)

 In this case, neither the Tribe nor the mother petitioned the juvenile court to transfer the matter to the Tribe's jurisdiction (25 U.S.C. 1911(b)); indeed, the Tribe never elected to actually intervene in the juvenile court proceedings (25 U.S.C. 1911(c)). Because there was never any effort to transfer dependency jurisdiction to the Tribe, we are hard pressed to imagine how the Tribe's resolution could have amounted to a judgment or other enforceable order. Thus, we have concluded the resolution was neither a judgment nor other order entitled to res judicata or collateral estoppel effect in the juvenile court under the ICWA's full faith and credit provision.

Given our assumption that the resolution was a public act or record, the second question which we must ask is: did the ICWA's full faith and credit provision require the juvenile court to substitute the resolution for California's statutory preference for adoption? The answer is clearly no.

As noted previously, the full faith and credit clause of our federal Constitution does not require a state to apply another state's law in violation of its own legitimate public policy. (*Nevada v. Hall, supra,* 440 U.S. at p. 422 [99

S.Ct. at p. 1189].) By analogy, we presume the same must be said of the ICWA's full faith and credit provision. In other words, we hold that the full faith and credit provision of the ICWA does not require a state court to apply a Tribe's law in violation of the state's own legitimate policy. If the Tribe wished to assert its own law in the matter of Laura and William, it could have done so by exercising its jurisdiction under the ICWA (25 U.S.C. § 1911(b)). The full faith and credit provision of the ICWA did not empower the Tribe to control the outcome of the proceedings here.

██ California has a compelling state interest in providing stable permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [19 Cal.Rptr.2d 544, 851 P.2d 826].) In furtherance of its interest in stability and permanence for dependent children who cannot return to parental custody, California has declared a strong preference in section 366.26 for adoption as the most permanent, and thus the best, plan for a dependent child. (*In re Jose V.* (1996) 50 Cal.App.4th 1792, 1799 [58 Cal.Rptr.2d 684].) Consequently, once a juvenile court determines in a particular case that adoption is feasible, the less desirable and less permanent alternatives of guardianship and long-term foster care need not be pursued. (*Ibid.*)

██ Here, the tribal resolution against adoption runs counter to California's strong preference for adoption of such dependent children. Prefatory language in the tribal resolution indeed acknowledges that "the statutory preference contained in California law for adoption of minors who cannot be returned to a biological parent within certain specified timeframes *is in direct conflict* with the long-standing child-rearing practices of the Tule River Indian Tribe, Indian family organization of the Tribe and the customs and traditions of the Tule River Indian Tribe . . . ." (Italics added.)

For the juvenile court to apply the tribal resolution, as the mother argues the court should have, would violate the state's own legitimate policy. Consequently, the ICWA's full faith and credit provision did not require the juvenile court to adhere to the tribal resolution.

II-V*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 583.

## DISPOSITION

The judgment terminating parental rights is affirmed. The petition to invalidate the termination order is denied.

Wiseman, J., and Moran, J.,* concurred.

A petition for a rehearing was denied September 26, 2000, and appellant's petition for review by the Supreme Court was denied November 15, 2000.

---

*Judge of the Tulare Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.